RODNEY AND AUDREY COLEMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Coleman v. Commissioner
Docket Nos. 5113-72, 7028-72.
United States Tax Court
T.C. Memo 1979-139; 1979 Tax Ct. Memo LEXIS 388; 38 T.C.M. (CCH) 605; T.C.M. (RIA) 79139; April 10, 1979, Filed Edward T. Haggins and Joseph H. Blackwell, for the petitioners. John P. Graham and R. Gary Lowen, for the respondent. *388 WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION *389 WILBUR, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to the Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b) [1]
1963
$ 710.58
$ 355.29
1964
1,347.66
673.83
1965
456.62
228.31
1966
2,671.26
1,335.63
1968
1,241.53
$ 62.08
1969
2,786.64
139.33
1970
1,477.02
73.85
*390 Respondent has amended his pleadings to claim increased deficiencies and additions to tax for the years 1966 and 1970 as follows: Additions to the Tax
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b)
1966
$ 3,024.72
$1,512.36
1970
1,806.66
$ 90.33
The issues for decision are: (1) Whether petitioners understated their taxable income for the years 1963 through 1966 and 1968 through 1970, and if so, the amounts of such understatements. (2) Whether, if petitioners did understate their taxable income for the years 1963 through 1966, any part of the underpayments of income tax in each of these years was due to fraud. (3) Whether the statute of limitations bars the assessment and collection of the deficiencies asserted against petitioners for the years 1963 through 1966. (4) Whether, if petitioners did understate their taxable income for the years 1968 through 1970, any part of the underpayments of income tax in each of these years was due to negligence. FINDINGS OF FACT Some of the facts *391 have been stipulated and are so found. The stipulation of facts, two supplemental stipulations of facts, and the attached exhibits are incorporated herein by this reference. Petitioners Rodney Coleman and Audrey Coleman are husband and wife who resided in Cleveland, Ohio at the time their petitions were filed herein. They timely filed joint Federal income tax returns prepared on the cash basis for the taxable years under consideration with the District Director of Internal Revenue at Cleveland, Ohio. Since Audrey Coleman is a party to this proceeding solely by virtue of having filed joint returns with her spouse, Rodney Coleman will be referred to as petitioner. Petitioner is an attorney who has been engaged in the practice of law in Ohio as a sole practitioner since approximately 1957. He obtained his law degree at the Ohio State University in June 1957. While attending law school, petitioner successfully completed courses in accounting, estate and gift taxation, and Federal income taxation. Petitioner's undergraduate major at Ohio State was paychology. Audrey Coleman was employed as a school teacher during the years 1960 through 1967. [2]
*392 Beginning in 1957 and continuing through the years at issue, petitioner conducted his law practice from an office located at 2250 East 105th Street in Cleveland. He acquired the real property at this location in December 1956 at a cost of $7,500.The only improvement on the land at this time was a cement block building used as a garage. Of the $7,500 purchase price, $5,775 was allocable to the land, and $1,725 was allocable to the building. Petitioner leased space in this building to his relatives for use in their automobile repair and television repair businesses, receiving an annual rental from the properties exceeding $1,200 during 1963 and 1964. On his Federal income tax returns for the years at issue, petitioner reported no income from these rentals and claimed no deductions for depreciation of the garage building. During 1957, a small one-story concrete block office building was constructed on the premises at 2250 East 105th Street for use by petitioner as his law office. Materials for the building cost approximately $3,000. Petitioner did most of the construction work on the building himself. He also had considerable gratuitous construction assistance, and occasionally *393 traded legal services for help with the building. He retained no invoices, canceled checks or any other original record for any costs associated with the office building. Petitioner claimed annual deductions of $500 for depreciation of the office building on his income tax returns for each year during the period 1958 through 1970. He computed the deduction for depreciation using the straight-line method, based on a reported cost basis of $10,000 and an estimated useful life of 20 years. Depreciation allowed on the office building for the years 1958 through 1962 totalled $2,500, and the unrecovered cost basis on December 31, 1962 was $500. Petitioner owned depreciable assets which he used in his law office. They consisted of law books, furniture, and a typewriter having an aggregate cost basis of $1,917.75. Petitioner claimed deductions for depreciation of these assets, and all these assets became fully depreciated at various times prior to or on December 31, 1970. On his Federal income tax returns for the years 1963 through 1970, petitioner reported receipts and expenses attributable to his law practice as follows: Expenses
(Including
Year
Gross Receipts
Depreciation
Depreciation)
Net Profit
1962
$ 6,283.10
$1,390.63
$3,742.04
$ 2,541.06
1963
6,761.00
1,390.63
4,518.06
2,242.94
1964
9,121.00
1,369.64
4,273.35
4,847.65
1965
9,172.00
1,327.39 4,780.07
4,391.93
1966
16,241.24
1,327.39
4,654.74
11,586.50
1967
13,395.86
1,407.58
5,187.19
8,208.67
1968
16,076.00
1,640.63
6,581.38
9,494.62
1969
16,655.11
1,588.13
7,171.88
9,483.23
1970
14,034.95
1,540.89
6,074.49
7,960.46
*394 Petitioner used four different Cadillac automobiles in his law practice at various times during the years 1960 through 1970. He claimed deductions on his Federal income tax returns for depreciation of these automobiles on the basis that 80 percent of the use of each automobile was for business. The specific details of petitioner's automobile transactions, including depreciation, are summarized in the following table: Auto Transactions For Rodney V. and Audrey W. Coleman
Basis
Purchase
or Sale
Business
Personal
Price (100%)
(80%)
(20%)
1960 Cadillac Purchased--Dec. 1959
$ 5,652.45
$ 4,521.96
$ 1,130.49
Depreciation Allowed, Per Return: 1960
( 667.08)
1961
( 667.08)
Unrecovered Basis--12/13/61
$ 3,187.80
$ 1,130.49
Trade-in Value--12/13/61
3,025.00
2,420.00
605.00
Nondeductible Personal Loss
[ 524.49)
Business Loss to Business Basis
$ 767.80
1962 Cadillac Purchased--12/13/61
5,119.00
4,095.20
1,023.80
Adjusted Basis--12/13/61
$ 4,863.00
Depreciation Allowable, Per Return,
Seven-Year, Straight Line:h
( 694.70)
1962
( 694.70)
1963
( 694.70)
Unrecovered Basis--12/21/63
$ 3,473.60
$ 1,023.80
Trade-In Value--12/21/63
2,950.00
2,360.00
590.00
Nondeductible Personal Loss
$ ( 433.80)
Business Loss to Business Basis
$ 1,113.60
1964 Cadillac Purchased--12/21/63
5,771.27
4,617.02
1,154.25
Adjusted Basis--12/21/63
5,730.62
1,154.25
Depreciation Allowable, Seven-
Year, Straight Line: 1964
( 818.66)
1965
( 818.66)
1966
( 818.66)
3/16/67
( 0.00)
Unrecovered Basis
$ 3,274.64
$ 1,154.25
Sale Price--3/16/67
2,250.00
1,800.00
450.00
Nondeductible Personal Loss
$ ( 704.25)
Deductible Business Loss--1967
$ 1,474.64
1967 Cadillac Purchased--4/03/67
5,900.00
4,720.00
1,180.00
Depreciation Allowed--1967
( 771.39)
Adjusted Basis--12/31/67
$ 3,948.61
Depreciation Allowable, Six-Year
Remaining Life, Straight Line: 1968
( 658.10)
1969
( 658.10)
1970
( 658.10)
*395 The information reported by petitioner on his income tax returns concerning the business use of these automobiles, including the depreciation claimed, is as follows: Depreciation
Allowed or
Allowable in
Current Year's *
Prior
Return Year
Date Acquired
Cost Basis
Years
Depreciation
1962
1/1/60
$5,837.01
$1,334.16
$ 667.08
1963
1/1/60
5,837.01
2,001.24
667.08
1964
1/1/60
5,837.01
2,668.32
667.08
1965
1/1/60
5,837.01
3,335.40
667.08
1966
1/1/60
5,837.01
4,002.48
667.08
1967
3/17/67
7,200.00
771.39
1968 3/17/67
7,200.00
771.39
1,028.57
1969
3/17/67
7,200.00
1,799.96
1,028.57
1970
3/17/67
7,200.00
2,828.53
1,028.57
A portion of the expenses deducted by petitioner as attributable to his law practice included the following amounts for an office in his residence: Deduction for
Return Year
Office in Home
1966
$ 600
1967
960
1968
960
1969
1,200
1970
1,200
Petitioner purchased a residence at 14104 Beckett Road in Shaker Heights, Ohio in May of 1960 for $19,000. He sold this *396 residence during 1966 for $20,800, and the sales commissions for its sale totaled $1,060. Petitioner acquired another residence in Shaker Heights during October of 1966 for $65,000, and owned this residence continuously through 1970.
Petitioner acquired five apartment buildings in east Cleveland as investment properties during the years 1962 through 1966. He owned each piece of real estate continuously from date of purchase through 1970. The pertinent data regarding these properties is summarized as follows: APARTMENT PROPERTIES
Allocations of Purchase Price between Bldg./Land
Street Address
& Rental Units
Date of
Purchase
Petitioner's
in Building
Purchase a
Lot Size
Price
Returns
11103 Ashbury
3/5/62
Ave. (6 suites)
(2/21/62)
40 feet X 120 feet
$36,000
$35,500--$ 500
1700 East 133rd
8/15/63
St. (11 suites)
(7/24/63)
100 feet X 145.87
66,500
65,000-- 1500
feet b
1684 East 133rd
4/14/64
St. (11 suites)
(4/2/64)
50 feet X 145.87
47,000
55,000--0
feet
1676 East 133rd
3/2/66
St. (11 suites)
(2/23/66)
50 feet X 145.87
57,000
57,000--0
feet
13300 Second
3/16/66
Ave. (14 suites)
(2/25/66)
120 feet,x 110 feet
87,000
87,000--0
*397 Street Address
& Rental Units
Respondent's
Petitioner's
Allocation
in Building
Brief
Brief
By Court
11103 Ashbury
Ave. (6 suites)
$31,217 c-$3600
$35,500--$ 500
$33,300--$2700
1700 East 133rd
St. (11 suites)
59,850-- 6650
64,067-- 2433 d
59,850-- 6650
1684 East 133rd
St. (11 suites)
42,300-- 4700
44,500-- 2500
43,475-- 3525
1676 East 133rd
St. (11 suites)
51,300-- 5700
54,500-- 2500
52,725-- 4275
13300 Second
Ave. (14 suites)
78,300-- 8700
84,300-- 2700
78,300-- 8700
Petitioner claimed depreciation deductions for each of these buildings during the years in issue. These deductions were computed in accordance with the allocations of *398 purchase price of the properties between the buildings and land listed above, using a straight-line method and 30 year useful life. On his returns for the years 1962 through 1970, petitioner reported gross rental income and operating expenses (exclusive of depreciation) from these properties in the following amounts: GROSS RENTAL INCOME AND OPERATING EXPENSES * FROM APARTMENT PROPERTIES Year
11103
1700 E.
1684 E.
1676 E.
13300
Ashbury
133rd
133rd
133rd
Second Ave.
1962
Rents
$5641.66
Expenses
6092.28
1963
Rents
6518.50
$3811.94
Expenses
6351.80
2413.72
1964
Rents
6780.00
9479.75
$5160.00
Expenses
5358.36
7888.22
5259.93
1965
Rents
6730.00
8000.00
7339.50
Expenses
5699.45
6182.75
7332.13
1966
Rents
7430.00
8704.50
8411.00
$6934.10
$10,853.50
Expenses
5777.55
7855.12
6789.53
6084.27
6,740.67
1967
Rents
7330.00
9472.50
8995.00
844 5.55
14,453.15
Expenses
5561.51
8648.51
7469.56
8908.26
10,638.66
1968
Rents
6620.00
9527.00
8194.00
8134.00
13,781.50
Expenses
5992.49
5970.84
7094.55
9220.06
8,737.40
1969
Rents
6865.00
8020.71
9115.00
8653.50
12,782. 00
Expenses
6057.11
7712.45
6815.19
7680.58
8,629.00
1970
Rents
6975.00
9634.00
10,014.00
9122.75
11,938.50
Expenses
5018.67
7598.61
5895.40
8239.58
8,970.72
*399 Petitioner borrowed money from his parents on various occasions during the years 1964, 1965 and 1966. He was indebted to them at the end of each year as follows: Year
Amount Owed on Dec. 31
1964
$ 251 *
1965
670
1966
3,063
1967
3,063
1968
3,063
1969
3,063
1970
3,063
These liabilities arose from checks drawn by either petitioner's father or mother on their Central National Bank account number XXXX1742, and cashed by Rodney v. Coleman, as follos: Check No.
Date
Amount
1234
1/11/64
$ 75.00
1274
5/28/64
94.51
1286
6/20/64
81.00
1350
1/11/65
78.00
1514
2/16/66
1,200.00
1518
3/15/66
93.00
1572
9/06/66
1,000.00
1636
12/21/66
100.00
As of January 4, 1968, petitioner had no record of any of these loans. Moreover, he was unable to remember if, or when, any of these loans were repaid. On or about May 15, 1963, petitioner filed an application for a $10,000 loan with the Central National Bank of Cleveland, Ohio. The purpose for this loan was to refinance an existing loan on petitioner's property *400 at 2250 East 105th Street, and for use in the purchase of rental income property. Petitioner submitted a financial statement as of May 17, 1963 with this application. On this financial statement, petitioner represented that the net income from his law practice was $12,101.16 (gross income of $13,844.13 less expenses of $1,742.97), and that he had net rental income as follows: Rental of Automobile Repair Shop
at 2250 East 105th St.
$ 900
Rental of Television Repair Shop
at 2250 East 105th St.
280
Rental of Tax office
at 2250 East 105th St.
300
Rental Income from Apartment Building
at 11103 Ashbury Avenue
5,100
In July 1963, petitioner filed a mortgage loan application with Park View Federal Savings and Loan Association for a loan to finance the purchase of rental income property at 1700 East 133rd Street, Cleveland, Ohio. On this application, he stated that his total annual net income was $18,600. In March 1964, petitioner filed a mortgage loan application with Park View Federal for a loan to finance the purchase of rental income property at 1684 East 133rd Street. On this application, he listed his annual net income as follows: Law Practice
$13,000
Net Rental Income from
Apartment Buildings at
11103 Ashbury Avenue and
1700 East 105th
8,200
Rental of Office and Business
Properties at 2250 East 105th
2,500
*401 In August 1966, petitioner filed a mortgage loan application with Aetna Life Insurance Company for a loan to finance the purchase of a new residence. In the personal financial statements accompanying the application, petitioner stated that the net income from his law practice for the year ending July 31, 1966 was $16,928.96 (gross income of $19,146.18 less operating expenses of $2,217.22). Petitioner also listed in detail the annual rental income and operating expenses from his rental properties as follows: Net Rental
Property
Gross Rentals
Operating Expenses
Income
11103 Ashbury Avenue
$ 7,680
$3,370
$ 4,310
1700 East 133rd Street
11,504
3,610
7,894
1684 East 133rd Street
10,848
3,558
7,290
1676 East 133rd Street
(estimated)
11,580
3,625
7,955
13300 Second Avenue
(estimated)
15,960
4,340
11,620
2250 East 105th Street
1,480 *
0
1,480
Petitioner received payment with respect to his law practice and rentals from the apartment properties in the form of services, *402 cash, money orders and checks. He kept his own business records and prepared his own Federal income tax returns for each of the years involved. However, petitioner did not keep formal double entry books and records. His method of record keeping was quite informal. It consisted of two envelopes which petitioner carried on his person. One envelope was designated "O" for office. In this envelope, petitioner kept the cash, checks, money orders and other receipts from his practice. The other envelope was designated "A" for apartments, and the rental receipts were kept in this envelope. Petitioner deposited the office receipts and the rental receipts several times a week to separate bank accounts. [3]
Petitioner maintained no personal checking account and no separate trust accounts for funds belonging to his clients. Therefore, he sometimes wrote checks on the office account for payments to or on *403 behalf of his clients. He also sometimes wrote checks for personal purposes on either the office account or the apartment account. Respondent commenced his investigation of petitioner in June of 1966. The investigation was initially conducted by a special agent and only pertained to the years 1964 and 1965. The matter was transferred to a second special agent early in 1967, at which time the scope of the investigation was expanded to include the years 1960 through 1965. The year 1966 was added later. The case was released by the Intelligence Division of the Internal Revenue Service in 1971. Thereafter, it was completed for civil tax purposes by two revenue agents, one assigned the years 1963 through 1966, the other the years 1968 through 1970. During the criminal investigation, petitioner permitted the special agents to examine some of his canceled checks for 1964 and 1965. However, he refused to allow the agents to examine any other canceled checks, including some for 1964 and 1965, for the reason that the checks withheld from examination were personal checks. Petitioner subsequently informed the special agents that he was withholding these records to prevent any verification *404 of his returns, and that he wished to use these records at some later time in the Tax Court. Petitioner refused to let respondent's agents examine what he represented were receipt books for his legal fees. In addition, he would not allow the agents to inspect his client files in which he stated fee sheets were kept. The refusal to allow inspection of these items was variously based on petitioner's assertion of the privilege against self-incrimination and the attorney-client privilege. Petitioner never produced the alleged fee receipts or fee sheets. Petitioner kept a ledger book for each apartment building. He permitted the first special agent handling the investigation to check the receipt figures for 1964 and 1965. The receipt figures contained in these ledger books roughly corresponded to the amounts reported in petitioner's returns for 1964 and 1965. The ledger books also listed the expenses for the apartment buildings, but no verification or substantiation of these expenses was produced. Petitioner refused to permit the second special agent investigating the case to examine these ledger books. Regarding the civil audits, petitioner refused to provide any information *405 or records to the revenue agent assigned the years 1968 through 1970, and no books or records to the agent assigned the years 1963 through 1966. On January 4, 1968, petitioner was interviewed at his office by a special agent and a revenue agent. The subject of cash on hand was discussed during this interview. Petitioner stated that he kept no cash in his office or at home. He further told the agents that he had a safe deposit box, and said that its only use other than for storage of papers would be for borrowed funds, funds which he would be holding to consummate a pending real estate transaction. However, petitioner indicated he never entered the box, and that his spouse Audrey would be the only person to enter it in handling such a transaction. After consulting with her husband, Audrey Coleman refused to provide any information or to make any statement about cash on hand. She did not testify at trial. Because petitioner failed to maintain or to submit for examination by the respondent complete and adequate books of account and records of his income and expenses for the taxable years 1962 through 1970, respondent used a net worth and expenditures method in order to determine *406 petitioner's correct taxable income. The summary of petitioner's assets, liabilities and reserves for accumulated depreciation, as constructed by respondent, for the period 1962 through 1970, and respondent's computation of the increase in petitioner's net worth and understatement of taxable income for the years 1963 through 1970 (excluding 1967), are as follows: Net Worth
Rodney and Audrey Coleman
Line
Assets
12/31/62
12/31/63
12/31/64
12/31/65
1
Cash on Hand
$ 100.00
$ 6,100.00
$ 100.00
$ 100.00
Cash in Banks:
Central
National: 2
# 63593
5.02
5.02
3
# 14207112
352.02
45.20
263.26
4
# 14126694
National City:
5
# 12087
4,182.09
6
# 6313059
Society
National: 7
# 1141564
119.87
138.69
251.44
239.15
8
# 050612
445.55
9
# 1171193
653.13
1,065.16
10
Parkview
706.47
24.55
Federal:
Real Estate: 11
Garage &
Land--
2250 E. 105th
7,500.00
7,500.00
7,500.00
7,500.00
12
Office
Building--
2250 E. 105th
3,000.00
3,000.00
3,000.00
3,000.00
13
Residence--
14104 Beckett
19,000.00
19,000.00
19,000.00
19,000.00
14
Residence--
17814 Parkland
Apartment
Properties: 15
11103 Ashbury
36,000.00
36,000.00
36,000.00
36,000.00
16
1700 E. 133rd
66,500.00
66,500.00
66,500.00
17
1684 E. 133rd
47,000.00
47,000.00
18
1676 E. 133rd
19
13300 Second
Avenue
Automobiles: 20
Cadillac--1962
$ 5,119.00
$
$
$
$ 21
Cadillac--1964
5,771.27
5,771.27
5,771.27
22
Cadillac--1967
23
Comet--1960
24
Office
1,917.75
1,917.75
1,917.75
1,917.75
Equipment
25
Snow Plow
300.00
26
Total Assets
$73,108.64
$146,684.40
$187,333.29
$191,955.81
*407 Line
12/31/66
12/31/67
12/31/68
12/31/69
12/31/70
1
$ 100.00
$ 0.00
$ 0.00
$ 0.00
$ 0.00
2
3
4
169.81
19.26
400.38
5
25.25
6
52.34
1.69
7
8
172.98
453.57
234.71
416.57
394.71
9
10
11
7,500.00
7,500.00
7,500.00
7,500.00
7,500.00
12
3,000.00
3,000.00
3,000.00
3,000.00
3,000.00
13
14
65,000.00
65,000.00
65,000.00
65,000.00
65,000.00
15
36,000.00
36,000.00
36,000.00
36,000.00
36,000.00
16
66,500.00
66,500.00
66,500.00
66,500.00
66,500.00
17
47,000.00
47,000.00
47,000.00
47,000.00
47,000.00
18
57,000.00
57,000.00
57,000.00
57,000.00
57,000.00
19
87,000.00
87,000.00
87,000.00
87,000.00
87,000.00
20
$
$
$
$
$
$ 21
5,771.27
22
5,900.00
5,900.00
5,900.00
5,900.00
23
400.00
400.00
400.00
400.00
400.00
24
1,917.75
1,917.75
1,917.75
1,917.75
1,917.75
25
26
$377,609.40
$377,692.27
$377,852.84
$378,287.45
$378,677.62
Net Worth
Rodney and Audrey Coleman
Liabilities
and
Accumulated
Line
Depreciation
12/31/62
12/31/63
12/31/64
12/31/65
Mortgages: 27
2250 E.
105th--
Central
$ 3,333.06
$ 9,637.45
$ 8,861.01
$ 8,032.57
National
28
14104
Beckett--
Central
15,074.62
14,517.22
13,971.03
13,392.60
National
29
17814
Parkland--
Frank A.
Schmidt &
Sons and Aetna
Society
25,212.16
24,100.23
22,914.05
21,648.34
National
31
11103
Ashbury--
Ida Viny
5,170.83
32
1700 E.
133rd--
Parkview
52,174.82
50,025.92
47,609.57
Federal
33
1700 E.
133rd--
Herb Cohen
Parkview
37,542.83
35,849.18
Federal
35
1684 E.
133rd--
Freda Hertz
36
1676 E.
133rd--
Gertrude
Goldberg
37
13300 Second
Avenue--
Almour
Securities
Loans Payable:
38
1962
Cadillac--
Prudential
1,317.00
39
1962
Cadillac--
Executive
1,667.25
Finance
40
1964
Cadillac--
Prentis
2,327.27
Loans Payable:
41
1964
Cadillac--
Central
$
$
$ 2,900.00
$ 1,508.00
National
42
1967
Cadillac--
Central
National
43
Louise
5,000.00
5,000.00
6,000.00
8,500.00
Goodrich
44
Charles
6,000.00
6,000.00
6,000.00
Whitmore
45
Parents
251.00
670.00
46
Lynn Coleman
1,500.00
2,825.00
2,825.00
2,825.00
47
J. Howard
Battle
48
Security
*h1,156.80
Deposits
Accumulated
Depreciation
49
2250 E.
105th--
Garage
524.68
610.93
697.18
783.43
50
2250 E.
105th--
Office
2,500.00
2,533.35
2,566.70
2,600.05
51
Office
886.20
1,109.85
1,312.00
1,472.31
Equipment
52
Apartment
1,183.00
3,256.95
7,268.40
11,749.85
Buildings
53
Snow Plow
60.00
54
Automobiles,
694.70
818.66
1,637.32
Business
55
Total
Liabilities
and
Accumulated
Depreciation
$58,892.67
$129,263.90
$163,953.78
$164,338.22
*408 Line
12/31/66
12/31/67
12/31/68
12/31/69
12/31/70
27
$ 7,148.64
$ 6,205.53
$ 5,199.26
$ 4,125.61
$ 2,980.04
28
29
39,753.99
38,817.01
37,729.33
36,468.67
35,223.70
20,297.84
18,856.91
17,319.48
15,679.06
13,928.79
31
32
45,044.19
42,322.22
39,545.53
36,519.44
33,437.08
33
4,738.79
34,051.06
32,142.44
30,221.63
28,103.95
25,957.65
35
6,531.07
36
45,515.25
43,429.03
41,214.14
38,862.63
36,666.05
37
68,117.95
65,137.86
61,958.22
58,565.63
54,945.85
38
39
40
41
$ 116.00
$
$
$
$
42
3,240.00
1,851.00
462.88
43
15,000.00
15,000.00
15,000.00
15,000.00
15,000.00
44
6,000.00
45
3,063.00
3,063.00
3,063.00
3,063.00
3,063.00
46
2,825.00
2,825.00
2,825.00
2,825.00
1,325.00
47
2,300.00
48
1,156.80
1,156.80
1,156.80
49
869.68
955.93
1,042.18
1,128.43
1,214.68
50
2,633.40
2,666.75
2,700.10
2,733.45
2,766.80
51
1,632.62
1,768.80
1,870.86
1,905.42
1,917.75
52
19,831.30
28,632.75
37,434.20
46,277.65
55,037.10
53
54
2,455.98
771.39
1,429.49
2,087.59
2,745.69
55
$329,082.56
$306,991.42
$301,560.22
$294,965.21
$287,365.98
*409 Net Worth
Rodney and Audrey Coleman
Item
12/31/62
12/31/63
23/31/64
12/31/65
12/31/66
Total Assets
$ 73,108.64
$146,684.40
$187,333.29
$191,955.81
$377,609.40
Total Liabilities
and Reserve for
Depreciation
58,892.67
129,263.90
163,953.78
164,338.22
329,082.56
Net Worth
$ 14,215.97
$ 17,420.50
$ 23,379.51
$ 27,617.59
$ 48,526.84
Prior Year
14,215.97
17,420.50
23,379.51
27,617.59
Increase
$ 3,204.53
$ 5,959.01
$ 4,238.08
$ 20,909.25
Personal Living *
6,728.01
7,080.69
5,567.05
10,363.45
1963 Loss on
Auto,
Nondeductible
433.80
1966 Gain on
Residence,
Not Recognized
( 740.00)
Adjusted Gross
$ 10,366.34
$ 13,039.70
$ 9,805.13
$ 30,532.70
Adjusted
7,580.31
5,762.12
7,582.27
18,941.91
Gross--Return
Understatement of
$ 2,786.03
$ 7,277.58
$ 2,222.86
$ 11,590.79
AGI
Understatement
2,604.87
7,557.76
2,264.23
9,465.73
S/N **
Increase
$ 181.16
$ ( 280.18)
$ ( 41.37)
$ 2,125.06
(Decrease)
Medical--3%
5.43
( 8.40)
( 1.24)
Taxable
5,705.33
7,338.32
5,723.34
22,640.24
Income--S/N**
Taxable Income
$ 5,891.92
$ 7,049.74
$ 5,680.73
$ 24,765.30
Revised
Taxable Income
3,013.08
( 490.73)
3,368.53
13,174.61
Reported
Inderstatement of
$ 8,759.26
$ 10,449.02
$ 9,009.33
Taxable
Income
$ 2,878.84
$ 7,540.47
$ 2,312.20
$ 11,590.69
Tax
$ 1,216.22
$ 1,289.95
$ 939.34
$ 5,935.51
Surcharge
Tax
1,216.22
1,289.95
939.34
5,935.51
Self-Employment
259.20
259.20
259.20
405.90
Tax Liability
$ 1,475.42
$ 1,549.15
$ 1,198.54
$ 6,341.41
Return
723.80
259.20
750.01
2,959.55
Deficiency
$ 751.62
$ 1,289.95
$ 448.53
$ 3,381.86
Additions-- §
375.81
644.97
224.26
1,690.93
6653(b)
§ 6653(a)
*410 Item
12/31/67
12/31/68
12/31/69
12/31/70
Total Assets
$377,692.27
$377,852.84
$378,287.45
$378,677.62
Total Liabilities
and Reserve for
Depreciation
306,991.42
301,560.22
294,965.21
287,365.98
Net Worth
$ 70,700.85
$ 76,292.62
$ 83,322.24
$ 91,311.64
Prior Year
48,526.84
70,700.85
76,292.62
83,322.24
Increase
$ 22,174.01
$ 5,591.77
$ 7,029.62
$ 7,989.40
Personal Living *
9,195.81
10,508.30
10,214.23
1963 Loss on
Auto,
Nondeductible
1966 Gain on
Residence,
Not Recognized
Adjusted Gross
$ 14,787.58
$ 17,537.92
$ 18,203.63
Adjusted
6,152.45
7,441.78
9,338.40
Gross--Return
Understatement of
$ 8,635.13
$ 10,096.14
$ 8,865.23
AGI
Understatement
7,789.56
12,793.62
7,404.46
S/N **
Increase
$ 845.57
$ ( 2,697.53)
$ 1,460.77
(Decrease)
Medical--3%
( 80.93)
Taxable
6,815.34
13,093.25
9,621.09
Income--S/N**
Taxable Income
$ 7,660.91
$ 10,314.79
$ 11,081.86
Revised
Taxable Income
( 1,098.35)
( 134.23)
2,072.53
Reported
Inderstatement of
Taxable
Income
Tax
$ 1,315.57
$ 1,889.25
$ 2,058.01
Surcharge
98.67
188.92
51.45
Tax
$ 1,414.24
$ 2,078.17
$ 2,109.46
Self-Employment
499.20
538.20
538.20
Tax Liability
$ 1,913.44
$ 2,616.37
$ 2,647.66
Return
499.20
538.20
840.82
Deficiency
$ 1,414.24
$ 2,078.17
$ 1,806.84
Additions-- §
6653(b)
§ 6653(a)
70.71
103.91
90.34
*411 OPINION Respondent has determined petitioner's taxable income for the years 1963 through 1970, excluding 1967, utilizing the net worth plus cash expenditures method of calculation. Respondent has also asserted the fraud penalty against petitioner in each of the years 1963 through 1966, and the negligence penalty in each of the years 1968 through 1970. Absent a finding of fraud, assessment of a deficiency for the years 1963 through 1966 would be barred by the statute of limitations. See section 6501(c)(1). 1. Underlying Deficiencies
In using the net worth method, respondent first attempts to establish the taxpayer's net worth at the beginning of a given year. He then computes increases in the taxpayer's net worth in each succeeding year under examination by calculating the difference in the *412 taxpayer's net worth at the beginning and the end of each year. To these increases certain adjustments are made including the addition of cash expenditures, such as living expenses. If the total increases in net worth are substantially greater than the taxable income as reported by the taxpayer, respondent claims the excess is unreported taxable income, unless it can be traced to a nontaxable source (such as a cash hoard, gifts, inheritances, loans, etc.). In the instant case, the petitioner disputes many of the items reflected in respondent's determination of the increase in petitioner's net worth and his understatement of taxable income. The items of significant amount in disagreement will be considered separately and in sequence. It should be noted insofar as the underlying deficiencies are concerned, the burden of proof is on petitioner with respect to the disputed items. Rule 142(a), Tax Court Rules of Practice and Procedure.Shahadi v. Commissioner,266 F. 2d 495 (3d Cir. 1959), affg. 29 T.C. 1157 (1958). Cash on Hand
Petitioner's first *413 objection to respondent's computation pertains to the amount of cash on hand at various dates. The major area of dispute involves cash on hand on December 31 of 1962 and 1967, which respondent determined to $100be and $0, respectively. Petitioner claims that he had cash on hand in the amount of $4,000 on December 31, 1962 and $3,867.05 on December 31, 1967. Petitioner has offered only his uncorroborated testimony in support of his claims. It would serve no useful purpose for us to review the record and our analysis of it in detail. Suffice it to say that, considering the record as a whole and the demeanor of petitioner as a witness, we find his testimony unconvincing.
With respect to the $4,000, we consider it significant that petitioner initially admitted in the pleadings respondent's amounts for cash on hand on December 31, for each of the years 1962 through 1966. [4] In addition, he indicated to a special agent and a revenue agent during their investigation of petitioner in 1968 that he didn't know if he had any cash on hand prior to 1963, and never asserted the existence of $4,000 cash on December 31, 1962 until after listening to respondent's case at trial. Our conclusion *414 is also influenced by the vagueness of petitioner's testimony regarding such a substantial amount of cash, and by the fact that such testimony was obviously self-serving. Moreover, he made no attempt to corroborate his testimony with any records, nor could we identify any likely source of such an amount of money based on this record. Neither do we accept petitioner's contention as to the existence of $3,867.05 in cash on December 31, 1967. Here again we find petitioner's testimony vague and unconvincing. Moreover, considering petitioner's payment in full of an obligation to Freda Hertz in the approximate amount of $5,693.90, one day after the $3,867.05 check for the refund of Audrey Coleman's contributions to a retirement fund was cashed, in light of the other financial data in the record, we find petitioner's contention regarding the $3,867.05 to be implausible. Accordingly, we conclude that the *415 amounts used by respondent for year-end cash on hand must be sustained. Bank Accounts
Petitioner maintained a number of bank accounts during the years at issue. He contends that the year end balances in two of the accounts contained only funds properly belonging to clients and are thus excludable from the asset listing of the net worth computation. [5] We disagree. Petitioner testified that he maintained no personal checking account during the years at issue. Rather he maintained a checking account for his law practice and one for his apartment properties. He wrote checks for *416 personal purposes on each account, and wrote numerous checks for client matters on the two accounts which petitioner claims are trust accounts. However, the occasional use of an account for the payment of obligations of clients (such as court costs, filing fees, etc.) does not make that account a trust account.Petitioner has not shown that these two accounts were used solely for payment of client obligations.In this respect, his failure to submit a complete sequential register of checks drawn on these accounts suggests otherwise. Also, his testimony was that the two accounts were not so used. Therefore, absent tracing of any separate funds belonging to clients, and petitioner has not done this, [6] we conclude that the year-end balances in these accounts did not represent funds belonging to clients. *417 Cost of Office Building
Petitioner contends that the small concrete block office building located on his property at 2250 East 105th Street and constructed in 1957 cost $10,000 to build. He has consistently used this amount as the cost basis for purposes of computing depreciation on his income tax returns. Respondent, however, contends that $3,000 is the proper basis for depreciation. The only evidence to support petitioner's claim is his testimony. This testimony is completely uncorroborated and is contradicted by a local building permit filed by petitioner stating the cost of construction to be $3,000, which he made no attempt to explain.Moreover, petitioner produced no construction cost records nor any evidence demonstrating how he financed the $10,000 cost of the building, other than his admission that much of the labor on the building was done by himself or by others in return for his legal services (neither of which would contribute to his cost basis on this record). In light of these admissions and the absence of any records corroborating petitioner's testimony, we view his testimony with skepticism. We therefore sustain respondent's position that the cost basis *418 of the building is $3000. Depreciation of Office Equipment
The cost basis of the depreciable assets used in petitioner's law office is not in dispute. Petitioner claims that for purposessf the net worth computation, the assets should be removed from the asset schedule once they have been fully depreciated, even while carrying the reserve for depreciation. We reject this contention because to do as petitioner proposes would distort taxable income. Cf. Logan v. Commission,T.C. Memo. 1976-143, on appeal (6th Cir., Dec. 23, 1976). Allocations of Cost of Apartment Properties
The parties disagree as to the proper allocations of the cost of the apartment properties between the land and the buildings. The purpose of the allocation is to determine basis for depreciation of the buildings. (The parties are in agreement regarding the method of depreciation and useful lives of the properties.) Petitioner argues that the value of the land is practically negligible. Respondent, on the other hand, proposes the following allocation rule: the value of the land is 10 *419 percent of the total purchase price of each apartment property. We do not agree with either party on this issue. Respondent's allocations are based on the opinion of one expert witness who applied the 10 percent rule. He described this allocation rule as a rule of general application to apartment properties in the east Cleveland area. We find his allocations to reflect sounder judgment than petitioner's. However, we have difficulty with the inflexible application of the 10 percent rule to all five of petitioner's apartment properties because the lots vary considerably in dimension. Accordingly, we make the following allocations of purchase price between building and land: Allocation of Purchase Price
Property
Building
Land
11103 Ashbury
$33,300
$2,700
1700 East 133rd
59,850
6,650
1684 East 133rd
43,475
3,525
1676 East 133rd
52,725
4,275
13300 Second Avenue
78,300
8,700
Loans by Petitioner's Parents
One major area of disagreement involves the amount of money petitioner received from his parents as loans, a nontaxable source of assets. The basic positions of the parties are presented in tabular form, as follows: Petitioner's
Respondent's
Allegations of Loans
Allegations of Loans
Cash
Checks
Notice of
Checks from
Date
From Mother
From Father
Deficiency
Exs. 1 & 4
May 8, 1963
$ 100.00
$
$
$
June 21, 1963
50.00
June 23, 1963
230.00
September 9, 1963
155.00
September 26, 1963
50.00
October 28, 1963
50.00
November 27, 1963
50.00
December 12, 1963
70.00
January 11, 1964
75.00
75.00
February 27, 1964
225.00
May 28, 1964
94.51
94.51
June 20, 1964
81.00
81.00
November 4, 1964
100.00
December 7, 1964
100.00
December 31, 1964
251.00
January 11, 1965
78.00
June 14, 1965
50.00
July 12, 1965
505.00
August 6, 1965
100.00
September 29, 1965
50.00
November 4, 1965
65.00
December 9, 1965
50.00
December 20, 1965
50.00
December 31, 1965
419.00
February 16, 1966
600.00
1,200.00
1,200.00
March 15, 1966
93.00
93.00
September 6, 1966
1,000.00
1,000.00
1,000.00
September 12, 1966
50.00
December 21, 1966
100.00
December 31, 1966
2,393.00
*420 In summary form, the parties' respective allegations regarding petitioner's year end liabilities to his parent2 are as follows: Petitioner's Allegations
Respondent's Allegations
Year
of Liability
of Liability
to
to Parents
December 31
Mother
Father
1962
$ 0
0
0
1963
755
0
0
1964
1,180
$ 250.51
$ 251
1965
2,050
250.51
670
1966
3,700
2,643.51
3,063
1967
3,700
2,643.51
3,063
1968
3,700
2,643.51
3,063
1969
3,700
2,643.51
3,063
1970
3,700
2,643.51
3,063
Respondent concedes the existence of petitioner's liability to his parents where the alleged transfer was by check. [7] Petitioner maintains that additional loans were made to him by his mother in cash. The source of the cash loans, he claims, consisted of virtually every withdrawal of $50 or more from his mother's savings account during 1963 through 1966. We conclude that the designated withdrawals from the savings account do not represent cash loans to petitioner. The only *421 evidence that the withdrawals from the savings account became cash loans to petitioner was his testimony to that effect. On the basis of the entire record, we find petitioner's testimony on this point unconvincing for several reasons. First, petitioner produced no records or any written evidence of indebtedness to his parents. Considering the frequency and aggregate amounts of the alleged loans, the existence of a mote for petitioner's debt to an uncle, and petitioner's profession, the absence of any note or other written evidence of indebtedness is disquieting. In addition, when interviewed by a special agent in 1968, petitioner could recall having no records of the alleged loans. When the question arose at trial, petitioner then claimed to have made, with the assistance of his mother, a record of the alleged loans prior to the 1968 interview. Petitioner's mother did not testify at trial, however, and since her testimony could have corroborated petitioner on this point, the inference is that she would not have supported petitioner. See Giddio v. Commissioner,54 T.C. 1530, 1535 (1970). *422 Finally, if we were to accept petitioner's theory about the cash loans, it requires the creation of two loans from his parents on September 6, 1966, each of $1,000, rather than what appears to be a withdrawal of cash to provide funds for the check. Accordingly, petitioner's theory that the cash withdrawals were loans strikes us as mere fabrication created for the purpose of the net worth computation. Office in Home
Respondent's computation of the increases in petitioner's net worth and of the increases in petitioner's taxable income allows as business expenses the deductions claimed in petitioner's returns for an office in his home. [8] Nevertheless, petitioner argues that he is entitled to a credit for home office expenses as an adjustment (a "below the line" adjustment allegedly in the nature of a nontaxable source of income) to the annual change in petitioner's net worth. *423 The amounts petitioner claims as credits, the amounts actually deducted in petitioner's returns, and the amounts allowed in respondent's net worth computation for the alleged office in home are as follows: Petitioner's Proposed
Petitioner's
Allowance by
Year
Adjustment
Returns
Respondent
1963
$ 960
1964
960
1965
960
1966
960
$ 600
$ 600
1968
1,200
960
960
1969
1,200
1,200
1,200
1970
1,200
1,200
1,200
Petitioner is not entitled to the claimed adjustment (a credit) in the net worth computation for the expenses of an office in his home because he would not be entitled to such a deduction from income on his returns. The only evidence supporting the existence of an office in the home was petitioner's testimony that he often did some typing relating to his law practice during the evenings on a card table set up in his living room. In the absence of further evidence bearing upon this issue, we think that the occasional use by petitioner of his living room in this manner is more a matter of personal convenience and comfort than measurable business *424 usage. This incidental use of one room in the house falls short of establishing that the room was his place of business. Sharon v. Commissioner,66 T.C. 515, 522-525 (1976), affd. per curiam,     F.2d     (9th Cir. 11/24/78); section 1.262-1(b)(3), Income Tax Regs.
Personal Living Expenses
In a net worth computation as employed by respondent in this case, the personal living expenses of a taxpayer constitute an addition to the increase in the net worth for each year. The positions of the parties regarding the amounts of personal living expenses incurred by petitioner are as follows: Year
Petitioner's Estimate
Respondent's Estimate *
1963
$5,500.00
$ 6,728.01
1964
5,500.00
7,080.69
1965
5,500.00
5,567.05
1966
5,500.00
10,363.45
1968
9,219.81
9,195.81
1969
9,602.30
10,508.30
1970
9,625.23
10,214.23
*425 After carefully reviewing and analyzing the evidence, we conclude that respondent's estimates of petitioner's personal living expenses should be accepted. [9]
Respondent's estimates for the years 1963 through 1966 were *426 computed on the basis of information provided directly or indirectly by the petitioner. Some of this information came from petitioner's income tax returns. The remaining information was supplied by petitioner during a 1971 interview with a revenue agent. Petitioner's only objection regarding the source of the data for these estimates is that he did not discuss the matter of personal living expenses for the years 1963 through 1966 with any revenue agent. On the basis of the testimony by the revenue agent, and his work papers, we find petitioner's objection to respondent's use of this information without merit. Moreover, by comparing the sum total of the amounts of personal items listed on petitioner's tax returns, various stipulated items, and contributions by Audrey Coleman to a retirement fund, to petitioner's estimates for each of the years 1963, 1964, and 1966, the conclusion is inescapable that $5,500 substantially understates the personal living expenses for these years. There is only minor disagreement as to the years 1968, 1969 and 1970. For these years petitioner has provided only estimates of his total expenses, without any itemization. He has refused to furnish records *427 or any other information to substantiate his estimates. Respondent's estimates are therefore based on data compiled and developed by the Bureau of Labor Statistics. Such statistics are an acceptable source of personal living expense data where a taxpayer refuses or fails to furnish information. See Giddio v. Commissioner,54 T.C. 1530 (1970); Leach v. Commissioner,T.C. Memo. 1977-243. Accordingly, we accept respondent's estimates for these 3 years. Depreciation for Automobiles
Petitioner owned and used three different Cadillac automobiles during the years 1963 through 1970. He claimed deductions for depreciation of these automobiles based upon the allocation of 80 percent of their use for business purposes. The parties claim the following amounts in their respective net worth computations for the accumulated depreciation of these automobiles: December 31
Petitioner
Respondent
1962
$ 667.08
$ 694.70
1963
1,334.16
1964
2,001.24
818.66
1965
2,668.32
1,637.32
1966
3,335.40
2,455.98
1967
771.39
771.39
1968
1,799.96
1,429.49
1969
2,828.53
2,087.59
1970
3,857.10
2,745.69
*428 Petitioner's computation of the reserve for depreciation for these automobiles is based on the amounts actually claimed for depreciation on his tax returns. However, these amounts are not consistent with the net worth asset account for the automobiles, and in part ignore sales, trade-ins, personal losses, [10] and business losses. For example, petitioner claimed depreciation for the years 1962 through 1966 on an automobile he stated was purchased January 1, 1960, whereas petitioner actually sold the automobile in December of 1961. Also, petitioner claimed depreciation for the years 1967 through 1970 on an automobile he reported had a cost basis of $7,200, whereas it was stipulated that petitioner actually purchased this automobile for $5,900. *429 Accordingly, petitioner's computation of accumulated depreciation distorts the net worth figure, and we sustain respondent's computation of this item. Security Deposits
Shortly after petitioner purchased the apartment property at 13300 Second Avenue in 1966, the seller of the property transferred the money held as tenant's security deposits to petitioner. Respondent concedes that the amount transferred to petitioner was $1,156.80. Respondent characterized the security deposits as an obligation of petitioner in the nature of loans payable. He therefore treated them on the net worth computation as a liability existing at the end of 1966 and each year thereafter after through 1970. Petitioner, on the other hand, characterized the $1,156.80 as a nontaxable receipt in 1966. Although the specific characterization of the security deposits by each party differs, the net effect of each characterization on taxable income for 1966 is identical. Moreover, respondent's treatment of the security deposits is more favorable to petitioner for the years 1968 through 1970 than is petitioner's treatment. We therefore accept respondent's characterization and treatment of the security *430 deposits for purposes of this net worth determination. Snow Plow
Petitioner objects to respondent's inclusion of a snow plow, valued at $300, in the list of assets owned by petitioner on December 31, 1965. He also disputes the $60 reserve for depreciation allowable on the snow plow for 1965. Petitioner claims that there was no testimony or evidence regarding the identity, ownership, or circumstances surrounding this item, and it should therefore not appear on the net worth computation. We disagree. The snow plow at issue was listed on petitioner's 1965 income tax return in the depreciation schedule for the rental properties. It was not shown on his returns for any subsequent year. Petitioner has provided no reason for or explanation why his admission about the snow plow should not be accepted. We therefore conclude that respondent's treatment of the snow plow was proper. 1960 Comet Automobile
Petitioner purchased a 1960 Comet station wagon for $400 on November 29, 1966. On brief, he maintains that his ownership of this automobile continued through December 31, 1968. The implication is that petitioner did not own this automobile on the 31st of December of *431 1969 or 1970, as respondent contends. Petitioner has offered little evidence to support his position about the length of time he owned this automobile. However, based on the record as a whole, giving due regard to petitioner's burden of proof as to the deficiencies, we conclude that petitioner owned the Comet on December 31, 1969 but not on December 31, 1970. Gain on Sale of Residence
Petitioner realized a $740 gain on the sale of his residence in 1966. [11]Under the mandatory provisions of section 1034 and section 1.1034-1, Income Tax Regs., this gain was not recognized because petitioner acquired another principal residence within the year. Petitioner claims that the sale transaction should be reflected in the net worth computation as an adjustment to the increase in petitioner's net worth for 1966. The adjustment, he argues, is as a credit for the "net profits" (proceeds) from the *432 sale of the residence in the amount of $6,273.94, the effect of which is to reduce the increase in petitioner's net worth for 1966. We disagree. The only relevance of the sale transaction in terms of the net worth computation is that it evidences a realization of the appreciation (or gain over the cost or other basis) in the property. The net profits (proceeds) claimed by petitioner represent his equity in the residence at date of sale. Aside from the gain element of the equity, the realization on the equity has no place in the net worth computation. This is due to the fact that the residence and any associated liabilities that were listed at the end of 1965 were disposed of or satisfied during 1966, and thereby were converted into other assets which were listed at or consumed by the end of 1966. Accordingly, the proper adjustment to the increase in petitioner's net worth for 1966 is a credit of $740. Proration Credits on Purchases of Apartment Properties
Petitioner claims that he received "non-taxable receipts and credits" as follows: Year
Amount [12]
1963
$1,272.95
1964
1,471.64
1966
1,052.43.
*433 He attributes these amounts to the proration credits of real estate taxes owing (by the seller) but not due on the purchases of four apartment properties. Petitioner contends that the proration credits constitute a source of nontaxable receipts or credits, the effect of which would be the increase in petitioner's net worth. We reject this contention. Where a contract for the purchase and sale of real property provides for the proration of taxes, the seller may either deposit the amount of taxes allocable to his ownership of the property in escrow, or transfer the amount directly to the purchaser to act as his agent. If the prorated amount must be listed as an asset (e.g. tax reserve account) on the net worth schedule of assets, an offsetting obligation for the taxes owed but not yet payable must be recognized. If the prorated taxes are paid during the year of purchase, there will be no yearend asset or liability for the prorated taxes. Moreover, since a cash basis purchaser of property (petitioner herein) is not entitled to a deduction from income for the payment of real property *434 taxes allocable to a period prior to the sale [(see section 164(c)(2) and (d)]), such payments are to be treated as nondeductible personal expenditures. In either case, the amount of the proration has no ultimate effect on the net worth computation.
Other Miscellaneous Items
Finally, petitioner claims that five additional items constitute nontaxable receipts and credits. They include three "insurance checks" in the amounts of $55.00, $51.15, and $112.94 received in 1964 and 1965, a credit in 1966 from the seller of the apartment property located at 13300 Second Avenue in the amount of $379.16, and the repayment of $100 in 1963 of a loan petitioner allegedly made in 1962.After carefully reviewing the evidence, we conclude that only one of these items is properly characterized as a nontaxable receipt or credit. Petitioner received insurance checks in the amounts of $55.00 and $51.15 as payment for damage claims to two of his apartment buildings. In both instances, petitioner received the check to compensate him for a loss, and then he made the needed repairs himself without any out of pocket expense. Therefore, these *435 amounts received by petitioner as insurance were actually taxable income, not a nontaxable receipt, because the insurance proceeds exceeded any adjustments to the adjusted basis of the property caused by the damage. See sections 61, 1033(a)(3)(A). The third insurance check ($112.94) was received for prorated insurance resulting from the closing of petitioner's 1964 purchase of an apartment property. It was received as a reimbursement or refund of the seller's unearned insurance premium that had been charged to petitioner when he purchased the property. Since the prorated insurance was contained in the escrow statement, and subsequently returned as a refund, it constitutes a nontaxable receipt. Neither of the remaining two items qualifies as a nontaxable receipt. The $379.16 item represents the payment of a disputed escrow item, prepaid interest, by the seller of the property in order to permit a closing. Petitioner acknowledged the payment and his eventual liability to the seller. Under these circumstances, the $379.16 item is *436 an alleged contingent obligation of petitioner which petitioner did not pay. Therefore, the seller's payment resulted in taxable income to petitioner under section 61(a)(12). As to the last item, the alleged loan and repayment both occurred during 1963, (rather than in 1962 as petitioner claimed) in which case there is no adjustment to the net worth computation. 2. Additions to Tax for Fraud
Respondent determined that part or all of the understatements in petitioner's income for years 1963 through 1966 were due to fraud. Respondent also relies on his allegations of fraud to defeat petitioner's assertion of the bar of the statute of limitations. The existence of fraud is a question of fact which must be ascertained upon an evaluation of all the facts of the case. Stone v. Commissioner,56 T.C. 213, 224 (1971); Stratton v. Commissioner,54 T.C. 255, 284 (1970). It consists of an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), *437 revg. and remg. 40 B.T.A. 424 (1939), Supp. Opinion 45 B.T.A. 822 (1941); Ross Glove Co. v. Commissioner,60 T.C. 569, 608 (1973). Respondent has the burden of proving the existence of fraud by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Foster v. Commissioner,487 F.2d 902, 903 (6th Cir. 1973), affg. T.C. Memo. 1972-188; Fox v. Commissioner,61 T.C. 704 (1974). This burden may be met with circumstantial evidence. Powell v. Granquist,252 F.2d 56, 61 (9th Cir. 1958); Gajewski v. Commissioner,67 T.C. 181, 200 (1976), affd. 578 F.2d 1383 (8th Cir. 1978). Such evidence includes conduct calculated to conceal or mislead. Gajewski v. Commissioner,supra;Beaver v. Commissioner,55 T.C. 85, 92-93 (1970). Respondent relies primarily on the pattern of *438 understatements of income to sustain his burden of proof. We are aware of the dangers inherent in proving fraud by understatements of income computed by te net worth method.See Holland v. United States,348 U.S. 121 (1954); Mazzoni v. Commissioner,T.C. Memo. 1970-37, affd. 451 F.2d 197 (3d Cir. 1971). Fraud will not be imputed or presumed and mere suspicion is insufficient to sustain a finding of fraud. See, e.g., Carter v. Campbell,264 F.2d 930, 935 (5th Cir. 1959). Nor will we infer unreported income merely from increases in net worth and then infer fraud from that unreported income, thereby piling inference upon inference. Mazzoni v. Commissioner,supra; see also Logan v. Commissioner,T.C. Memo. 1976-143. At the same time, a repeated failure to report income over the years, including income reflected by increases in net worth, is evidence of fraud, if unexplained and sufficiently extensive. Lee v. United States,466 F.2d 11 (5th Cir. 1972); Schwarzkopf v. Commissioner,246 F.2d 731, 734 (3d Cir. 1957), *439 affg. on this issue T.C. Memo. 1956-155; Mazzoni v. Commissioner,supra.Moreover, the addition to tax attaches where "any part of any underpayment * * * is due to fraud." Section 6653(b); Stone v. Commissioner,supra at 220-221. With the preceding in mind, we have exercised extreme care to assure that respondent's reliance on the underlying deficiencies, on which petitioner has the burden of proof, does not have the effect of relieving respondent from his burden of proof on the fraud issue. Here, we think it clear that respondent has carried his burden of proof. Although numerous items affecting the net worth computation were disputed, most of the items in dispute involving significant amounts of money or value either were stipulated or were based on admissions by petitioner. [13] In addition, we have determined that some of the disputed items have no effect on the net worth computation. With respect to one item, the cost basis of the office building, however, we hold for purposes of the fraud issue, that respondent has not carried his burden of proof. Accordingly, insofar as proof of fraud is based on understatements of *440 income, the allowance for accumulated depreciation on that building solely for purposes of determining whether fraud exists was computed in accordance with petitioner's position herein, i.e., a cost basis of $10,000. A net worth statement prepared on the basis of our findings, adjusted in accordance with the foregoing, shows that approximately the following amounts of taxable income were omitted from petitioner's returns. Understatement of
Year
Taxable Income
1963
$ 2,400
1964
6,900
1965
1,775
1966
11,000
1968
5,875
1969
6,350
1970
4,925
We conclude that these amounts for understatements of taxable income do indeed disclose a consistent pattern of omitted income and overstatement of deductions for the years 1963 through 1966. This pattern of understatements in taxable income by itself strongly suggests that the omissions and overstatements were intentional, particularly since *441 the understatements in taxable income are substantial in relation to the total reported taxable income. Moreover, our conclusion is buttressed by the existence of clearly indicated sources of unreported income, e.g., the fees from petitioner's law practice and rentals collected in cash [see Holland v. United States,supra.], and petitioner's statements on loan applications indicating the receipt of income in amounts exceeding that which he returned and identifying sources of rental income which he did not report on his returns. Petitioner has failed to explain the discrepancies or to give any plausible explanation for the understatements indicated by the net worth computation. Under such circumstances, the inference of fraud is exceedingly strong. Klassie v. United States,289 F.2d 96 (8th Cir. 1961); Schwarzkopf v. Commissioner,supra.
Many other circumstances suggest that petitioner concealed or misstated his true income. First, petitioner is an intelligent, well educated and articulate attorney, whose experience and knowledge *442 of tax matters, as evidenced by his preparation of his returns, are such that he must have known he was omitting income. Moreover, we are convinced that his failure to maintain and produce adequate books and records, together with the personal control he exercised over cash receipts from his law practice and rental properties, his lack of cooperation during the investigation, and the often inconsistent and convenient statements regarding his income taxes and returns all were part of a calculated design to conceal and mislead. See Spies v. United States,317 U.S. 492, 499 (1943). Finally, petitioner's deliberate and knowledgeable underpayment of tax is no more evident than with respect to his depreciation of two rental properties, and the cost basis claimed for those properties on his returns. In one instance, petitioner claimed a cost basis for rental property actually exceeding its purchase price by $8,000. In the other, petitioner allocated no part of the purchase price for the apartment property to nondepreciable land, although he previously had made such allocations *443 on other properties. [14]
Therefore, when the pattern of understatements of taxable income is considered in light of the other indicia of fraud present herein, and summarized above, the conclusion that petitioner fraudulently understated his income is inescapable. Foster v. Commissioner,487 F.2d 902 (6th Cir. 1973), affg. T.C. Memo. 1972-188. Petitioner's defense on the issue of fraud is limited to his assertion that any understatements in taxable income were due to his negligence, and that a finding of fraud is therefore unwarranted. We have considered and rejected this claim in the preceding paragraphs, and reaffirm our conclusion that petitioner's understatements of taxable income were deliberate *444 and intentional, with the purpose of evading a tax believed to be owing.Petitioner also claims that his lack of cooperation during the investigation and his failure to produce adequate records are not indicators of fraud, but rather result from his claims of privilege. We reject this argument as being without any basis in fact. Moreover, the privileges claimed by petitioner do not excuse or justify his failure to cooperate subsequent to the termination of the criminal investigation. Accordingly, we conclude that respondent has proven fraud with respect to the years 1963 through 1966 by clear and convincing evidence. Our decision on the fraud issue also disposes of petitioner's assertion that the statute of limitations bars the assessment and collection of the deficiencies determined herein. Section 6501(c)(1).
3. Additions to Tax for Negligence
The final issue is whether petitioner is liable for the additions to tax for negligence under section 6653(a) for the years 1968 through 1970. Petitioner did not actively contest the additions to tax for negligence.In fact, he even asserted his negligence as a defense to fraud in the earlier years before the Court.Our *445 own analysis of the record convinces us that the deficiencies in tax for these 3 years were a result of petitioner's negligent and intentional disregard of the rules and regulations, especially those under section 6001. Thus, respondent's determination with respect to the section 6653(a) additions to tax is sustained. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.↩
2. Audrey Coleman received a check dated September 27, 1967 in the amount of $3,867.05 from the State Teachers Retirement System upon termination of her teaching employment. This check was cashed on October 3, 1967.↩
*. Depreciation computed using straight-line method and 7-year useful life.↩
a. The listed date of purchase is the date the deed to petitioner was recorded, and the dates of deed for each property are listed parenthetically. ↩
b. This property at purchase consisted of two adjacent lots, one of which was vacant. ↩
c. This building was acquired in 1962, and petitioner was allowed $1,183 for depreciation for 1962, leaving an unrecovered basis of $31,217 as of December 31, 1962. ↩
d. These amounts have been rounded off. The exact amounts are $64,066.85 and $2433.15.↩
*. The operating exepnses do not include depreciation.↩
*. Exact amount owed on December 31, 1964 was $250.51.↩
*. The rental income from this property consisted of $900 from an automobile repair shop, $280 from a television repair shop, and $300 from an income tax office.↩
3. The petitioner had undeposited cash on hand on December 31 of each of the years 1962 to 1966, inclusive, in the amounts $100of, $6,100, $100, $100, and $100, respectively. Petitioner had no undeposited cash on hand on December 31 of each of the years 1967 to 1970, inclusive.↩
*. Respondent computed this item on the basis of information contained in petitioner's returns or obtained in interviews with petitioner, and data regarding costs of living compiled by the Bureau of Labor Statistics.
** S/N is an abbreviation for the statutory notice of deficiency.↩
4. Since petitioner admitted respondent's amounts of cash on hand for December 31 of 1964, 1965, and 1966, and he has offered no evidence in support of his claim that he had no cash on hand on these dates, we accept respondent's figure of $100 for each of these three dates.↩
5. The accounts petitioner claims are essentially trust accounts are account number XXXX7112The accounts petitioner claims are essentially trust accounts are account number XXXX7112 at the Central National Bank and account number XX0612 at the Society National Bank. at the Central National Bank and account number XX0612 at the Society National Bank. Savings account number X3593 at the Central National Bank illustrates the parties' resolve to place in issue as many items in the net worth computation as possible. A copy of the account ledger for this account, in the name of Rodney V. Coleman, was submitted in evidence. We find that the balance of $5.02 in this account on December 31 of 1963 and 1964 should be included as assets in the net worth computation.Savings account number X3593 at the Central National Bank illustrates the parties' resolve to place in issue as many items in the net worth computation as possible. A copy of the account ledger for this account, in the name of Rodney V. Coleman, was submitted in evidence. We find that the balance of $5.02 in this account on December 31 of 1963 and 1964 should be included as assets in the net worth computation.↩
6. Petitioner testified that it was his practice to withdraw all personal funds in the two accounts at the end of each year, thereby leaving only client funds in the accounts. Besides being quite contrived, this claim is belied by the record in this case which shows no other category of asset (cash on hand or other checking accounts) containing a sufficiently large balance to be a possible recipient of such a cash transfer.↩
7. Respondent has actually allowed as loans to petitioner from his parents for the net worth computation an amount for 1965 that is $341 more than the canceled checks in evidence.↩
8. The allowance of these expenses as deductions is accomplished because respondent's net worth computation focuses on the difference between petitioner's taxable income (and adjusted gross income), as computed by respondent, and the amount of taxable income (and adjusted gross income) as reported on petitioner's income tax returns. Since the amount for taxable income (and adjusted gross income) returned had been reduced by virtue of deductions for the office in petitioner's residence, the understatements in taxable income (and adjusted gross income) reflect the deduction for the home office as if allowed by the respondent. Therefore, as to the amounts respondent has allowed in the years 1966-1970, allowance of the adjustment for the home office to the extent of the amounts deducted on petitioner's returns would have a duplicative effect in the net worth computation.↩
*. Respondent's estimates are those used at trial and on brief. These amounts reflect the corrections made by respondent to the amounts used in the computation of the statutory notices of deficiency.↩
9. Respondent's estimate of petitioner's personal living expenses for 1966 includes a finder's fee payable to J.Howard Battle in the amount of $2,300. This liability arose in connection with petitioner's 1966 purchase of a residence at 17814 Parkland in Shaker Heights. In his net worth computation, respondent has treated the fee payable as a liability and as a personal living expense. The effect of the two items is to offset each other. Alternatively, the expense item could have been treated, as petitioner suggests, as an increase in the basis of the residence at 17814 Parkland. The ultimate effect of either treatment of the fee payable on the net worth computation for the year 1966 is ideitical. As to the years subsequent to 1966, since the finder's fee was a cost of acquiring petitioner's residence, it must be included in the basis of the property for purposes of the net worth computation. Therefore, the basis of the Parkland residence is $67,300.↩
10. Petitioner incurred a $433.80 nondeductible personal loss on the disposition of a 1962 Cadillac automobile in December 1963, but has ignored this item entirely in his net worth computation. Respondent treated this loss in his net worth computation as a nondeductible personal expenditure by petitioner in 1963. This treatment serves as an addition to petitioner's increased net worth during 1963, which we conclude is the proper treatment of the item.↩
11. Gain was determined as follows: the sales price of the old residence was $20,800, its purchase price was $19,000, and sales commissions totalled $1,060.↩
12. The escrow statements relating to the apartment properties purchased do not correspond exactly to the amounts petitioner claims are prorated taxes.Rather, the statements provide for the following prorations: ↩
Item Prorated
Year
Property
or Credited
Amount
1963
1700 East
Taxes
$ 849.45
133rd
Rents
423.50
1964
1684 East
Taxes
1,181.31
133rd
Rents
199.83
Title Search
90.50
1966
1976 East
Taxes
847.60
133rd
13300 Second Ave.
Taxes
1,646.12
13. For example, respondent's calculations of the petitioner's personal living expenses during the years 1963 through 1966 were based on information that was stipulated, and on information provided by petitioner in his returns and in interviews with revenue agents.↩
14. The deliberate overstatement of deductions is also indicated by petitioner's treatment on his return of automobiles used for business purposes. For example, petitioner purchased a Cadillac in 1967 for $5,900, but computed depreciation on the automobile by claiming a cost basis of $7,200. This illustrates petitioner's consistent practice of basing depreciation deductions, including the years 1963 through 1966, on overstatements of basis.↩